# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 05-CV-4990 (JFB)

JERMAINE ARCHER,

Petitioner,

VERSUS

BRIAN FISCHER, SUPERINTENDENT,

Respondent.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 13 2009 ★

LONG ISLAND OFFICE

---

## MEMORANDUM AND ORDER
April 13, 2009

---

JOSEPH F. BIANCO, District Judge:

Jermaine Archer (hereinafter, "Archer" or "petitioner") petitions this Court for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court.

Petitioner was convicted in a judgment rendered on April 26, 1999, following a jury trial in the Supreme Court of New York, Kings County. Petitioner was convicted of Murder in the Second Degree (N.Y. Penal Law § 125.25[2]), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02[4]). Petitioner was sentenced to an indeterminate term of imprisonment of twenty-two years to life for the second-degree murder charge, and determinate sentences of seven years for the second-degree weapon possession and five years for the third-degree weapon possession, with all to run concurrently.

Petitioner challenges his conviction on the following grounds: (1) the evidence at trial was legally insufficient to establish petitioner's guilt beyond a reasonable doubt because (a) the sole eyewitness committed perjury and (b) the specific elements of depraved indifference murder were not met; (2) the trial court violated petitioner's double jeopardy rights by reinstating the jury's guilty verdict (after initially granting defendant's motion to set aside the verdict); (3) the prosecutor's summation was improper; (4) the depraved indifference murder statute is unconstitutionally vague; (5) ineffective

assistance of counsel at trial; and (6) ineffective assistance of counsel on appeal.

For the reasons stated below, petitioner's request for a writ of *habeas corpus* is denied in its entirety on the merits.

## I. BACKGROUND

### A. The Facts

The following facts are adduced from the instant petition and underlying record.

#### 1. The Evidence at Trial

On July 21, 1997, at 11:30 p.m., on Westminster Road near Caton Avenue in Brooklyn, New York, Archer fired several shots into a car. One shot struck Patrick Niles (hereinafter, "Niles") in the head, killing him. (Tr. at 30-35, 125, 138-40.)[1]

At trial, the principal witness against Archer was Carlos Bethune (hereinafter, "Bethune"), the driver of the car. Bethune testified that he became familiar with Archer through seeing Archer socializing in the area of Westminster Road and Church Avenue. (Tr. at 11-13.) However, Bethune had no relationship with Archer. (*Id.*)

Bethune testified that the night before the shooting (July 20, 1997), he and Niles' brother, Reynaldo Niles (hereinafter, "Reynaldo"), had a confrontation with Archer. (Tr. at 13-15, 111.) Reynaldo was speaking to a girl named Lucy, who was on the street, when Archer and two companions came along. (*Id.*) Archer asked Lucy if he could borrow her bicycle to

go to a store, but Lucy refused because the bicycle was not hers. (Tr. at 13-14.) When Archer persisted, Bethune and Reynaldo told him to leave Lucy alone. (Tr. at 13-14, 22-23, 114-16.) Archer said that everything was okay, and Bethune and his companions left. (Tr. at 15-16, 23, 116-17.)

Bethune testified that he had two more confrontations with Archer after that incident. (Tr. at 21, 23-24, 27-28, 90-91, 102-106.) The second incident happened the same night of the bicycle incident. Bethune testified that later that night, Bethune was driving towards Argyle Road when he saw Archer with four or five other companions at Argyle Road and Church Avenue. (Tr. at 21, 23-24, 90-91, 102.) Bethune's group and Archer's group stared and cursed at each other. (Tr. at 23, 91, 102-06.) Archer had his hands in his waist. (*Id.*) Bethune stopped his car and got out with Reynaldo. (*Id.*) Bethune and Reynaldo asked what the problem was. Archer said there was no problem, took his hands from his waist and lifted his shirt (as if to show that he had no gun). (*Id.*) Bethune and Reynaldo got back in the car and drove away. (*Id.*)

The third incident happened the following day, on July 21, 1997. (Tr. at 27-28.) Bethune drove to pick up some clothes from the cleaners at Westminster Road and Church Avenue before picking up Niles to go to work. (*Id.*) Archer and two of his friends were on the opposite corner. (*Id.*) Archer's group looked at Bethune, and Bethune looked back at them. Bethune got his clothes and went on his way without a confrontation. (*Id.*)

On July 21, 1997, at 11:30 p.m., Bethune was driving his car with Niles in the passenger seat. (Tr. at 30, 32, 40, 43-44.) Bethune slowed down to allow a disabled woman to cross the street. (Tr. at 31, 44.) A van was to

---

[1] References to "Tr." are to pages of the trial transcript.

his right. (Tr. at 31, 34-37, 42, 44.) Bethune testified that he had a clear view ahead because both the street lights and the headlights of his car were on. (Tr. at 32-33, 59.) Archer suddenly emerged from around the van to the right side of the car. (Tr. 31, 37, 45, 137.) Bethune testified that he saw Archer's face through the windshield and recognized him. (Tr. at 37-38.) Archer pulled out a gun from his waist and fired three or four shots into the car. (Tr. at 31, 42-45, 138-140.) The first shot hit the back window of the car, the second shot passed in front of Bethune's forehead, and the third shot struck Niles in the back of the neck. (Tr. at 31, 144-147.)

On April 26, 1999, after a jury trial, petitioner was found guilty of Murder in the Second Degree [N.Y. Penal Law § 125. 25[2]], Criminal Possession of a Weapon in the Second Degree [N.Y. Penal Law § 265.03[2]], and Criminal Possession of a Weapon in the Third Degree [N.Y. Penal Law § 265.02[4]].

### 2. Motion to Set Aside Verdict

Following the guilty verdict, petitioner made a motion to set aside the verdict, dated June 18, 1999, pursuant to New York Criminal Procedure Law §330.30 on two grounds: (1) that the preclusion of Michael Archer as a witness denied defendant a fair trial; and (2) that newly discovered evidence in the form of audiotapes purported to contain a confession to the murder of Niles by Yassir Julio (hereinafter, "Julio").

At a hearing held on July 19, 1999, Michael Archer testified that he did not falsify audiotapes that purported to contain Julio's alleged confession to the murder. (H2. at 22.)[2] However, Bruce Koenig, a consultant who analyzes audio and video recordings, testified that the audiotapes had numerous over-recordings. (H3. at 71, 73, 76, 88, 90-92, 95, 121.)[3]

On the date the court originally planned to render its decision on the motion, February 25, 2000, Bethune appeared and testified under a grant of immunity from the prosecution for his testimony at the hearing. Bethune reconfirmed that his trial testimony had been truthful, but that he was no longer certain of Archer's identity as the shooter. (H4. at 7-8, 11, 28-29.)[4] Bethune became uncertain when, after trial, a friend from Florida named Esteban Mendoza visited him and told him that the word on the street was that Julio was the shooter, that Julio had confessed on audiotapes, and that Julio and Archer resembled each other in appearance. (H4. at 19-20, 22-24, 97-98.)

On March 10, 2000, the trial court granted the motion to set aside the verdict based upon Bethune's recantation and the audiotapes, which the court considered to be historical background for Bethune's uncertainty about his identification. (PT1. at 27-28.)[5]

---

[2] References to "H2." are to pages of the hearing held on July 19, 1999.

[3] References to "H3." are to pages of the hearings held on November 1, 1999 and November 19, 1999.

[4] References to "H4." are to pages of the hearing held on February 25, 2000.

[5] References to "PT1." are to pages of the post-trial proceedings on March 10, 2000.

### 3. Reconsideration of the Motion to Set Aside Verdict[6]

On March 29, 2000, the People moved for reconsideration of the motion to set aside the verdict on two grounds: (1) that Esteban Mendoza had been incarcerated in Florida and could not have visited Bethune; and (2) that Bethune's recantation was part of an agreement between Archer's family and Reynaldo to have petitioner released from incarceration in exchange for petitioner's brother, Michael Archer, dropping pending charges against Reynaldo for shooting him (Michael Archer), in retaliation for petitioner shooting Niles. Michael Archer submitted an affidavit to the Queens County District Attorney stating that he would not testify against Reynaldo.

Petitioner's trial counsel objected to the People's motion on the grounds that the new evidence did not undermine Bethune's recantation because Bethune was not a member of the Niles family and, thus, had no motive to be part of this agreement. (PT2. at 5.) However, the court granted the People's motion to reconsider and reopen the hearing on the motion to set aside the verdict on the ground that it had the inherent power to examine actions that may have been obtained by fraud. (PT2. at 5-6.)[7]

On May 19, 2000, defense counsel moved to be relieved as counsel after becoming aware of Michael Archer's affidavit and after confronting Michael Archer about his contacts with Reynaldo. Michael Archer had repeatedly assured petitioner's counsel that he had no contact and had made no deals with Reynaldo. However, based upon the information available to him at the time, counsel testified that he had no good faith basis for going forward with the opposition to the motion to set aside the verdict and that he had a conflict between his responsibilities as an officer of the court not to mislead the court and his responsibility to represent petitioner vigorously. (PT3. at 25-26.)[8] The court granted defense counsel's motion to be relieved and assigned new counsel for petitioner.

At the reopened hearing, Reynaldo testified under a grant of immunity from the People for any crime revealed in his testimony, except for the crime of perjury. Reynaldo testified that two weeks after he learned from Bethune that Archer had killed his brother, he shot Michael Archer in retaliation. (H5. at 79-82.)[9] Reynaldo further testified that Michael Archer and his mother had approached him outside the Queens County Courthouse about a plan that would release both petitioner and Reynaldo. (H5. at 23-25, 84-90, 121.) They agreed that, if Reynaldo could get Bethune to recant his testimony in Archer's trial, Michael Archer would not testify against Reynaldo. (H5. at 24, 90.) Thus, Reynaldo convinced Bethune to recant his testimony against Archer. Nevertheless, Michael Archer still testified against Reynaldo in his case in Queens County. (H5. at 68.) After Michael Archer's testimony, Reynaldo pled guilty and exposed this deal he had with Michael Archer. (H5. at 22, 70.)

---

[6] Defendant absconded and a bench warrant was issued on May 12, 2000 for his arrest. Defendant was not present for any further proceedings in court until execution of his sentence.

[7] References to "PT2." are to pages of the post-trial proceedings on March 29, 2000.

[8] References to "PT3." are to pages of the post-trial proceedings on May 19, 2000.

[9] References to "H5." are to pages of the reopened hearing held on July 14, 2000 and July 28, 2000.

Bethune also testified at the reopened hearing under a grant of immunity from the People that he lied in his testimony at the hearing on the motion to set aside the verdict, and that his trial testimony identifying Archer as the shooter had been truthful. (H6. at 17, 22.)[10] Thereafter, on August 29, 2000, the court found beyond a reasonable doubt that the order setting aside the verdict had been obtained by fraud and granted the People's motion to vacate the order setting aside the verdict and reinstated the verdict.

### B. Procedural History

On October 12, 2000, petitioner was sentenced *in absentia* as a second violent felony offender to concurrent prison terms of twenty-two years to life for murder, seven years for second-degree weapons possession, and five years for third-degree weapons possession. On May 30, 2001, petitioner was returned to court and the sentence was executed.

On July 14, 2003, petitioner, with the assistance of appellate counsel, appealed his judgment of conviction to the New York State Supreme Court, Appellate Division, Second Department. Petitioner raised three claims: (1) ineffective assistance of trial counsel because trial counsel allegedly failed to object to the reopening of the hearing on the motion to set aside the verdict and because trial counsel allegedly made prejudicial statements when he sought to be relieved; (2) the trial court's reinstatement of the verdict after having granted the motion to set aside the verdict violated petitioner's right against double jeopardy; and (3) the sentence was excessive.

(*See* Brief for the Defendant-Appellant; Respondent's Exh. B.) On March 29, 2004, by *pro se* supplemental brief, petitioner raised a claim of improper summation and raised three other claims that collectively challenged the legal sufficiency of the evidence as it relates to Bethune as the sole witness.

On September 30, 2004, the Appellate Division unanimously affirmed the judgment of conviction. *People v. Archer*, 784 N.Y.S.2d 567 (N.Y. App. Div. 2004). The court held that the evidence was legally sufficient and that the verdict was not against the weight of the evidence. *Id.* The court also held that the reinstatement of the verdict did not violate the right against double jeopardy, that the sentence was not excessive, and that the remaining claims, including the claims in the supplemental brief, were without merit. *Id.*

On November 4, 2004, petitioner, with the assistance of appellate counsel, applied for leave to appeal to the New York Court of Appeals. Petitioner sought review of the ineffective assistance of trial counsel and double jeopardy claims. On November 23, 2004, petitioner submitted a *pro se* supplement to the leave application, raising the claims that had been raised below in the supplemental brief to the Appellate Division. On December 21, 2004, the petitioner's application for leave to appeal to the New York Court of Appeals was denied. *People v. Archer*, 824 N.E.2d 54 (N.Y. 2004).

On March 6, 2004, while his appeal to the Appellate Division was still pending, petitioner made a motion to vacate the judgment in New York Supreme Court pursuant to New York Criminal Procedure Law § 440.10. Petitioner raised a claim of ineffective assistance of trial counsel because trial counsel allegedly failed to call certain witnesses. Petitioner also

---

[10] References to "H6." are to pages of the reopened hearing held on August 29, 2000.

claimed that the depraved indifference murder statute under which he was convicted was unconstitutionally vague.

On July 19, 2004, the New York Supreme Court summarily denied petitioner's motion to vacate the judgment. The court held that petitioner failed to support his motion with affidavits from his potential witnesses. *People v. Archer*, Indictment No.: 2893/98 (N.Y. Sup. Ct. July 19, 2004) (unpublished opinion). The court further held that trial counsel rendered effective assistance because counsel's decision about which witnesses to call was based upon sound trial strategy. The court also held that the murder statute was not unconstitutionally vague.

By papers dated August 29 and October 7, 2004, petitioner applied for leave to appeal the denial of his motion to vacate the judgment to the Appellate Division on all the claims he raised with the lower court in his Section 440 motion. On November 17, 2004, the court denied petitioner's application. *People v. Archer*, Indictment No. 2004-07698 (N.Y. App. Div. Nov. 17, 2004) (unpublished opinion).

On February 14, 2005, petitioner moved in the Appellate Division for a writ of error *coram nobis*. Petitioner claimed ineffective assistance of trial counsel for the same reasons set forth in his claims on direct appeal and in his motion to vacate the judgment. Petitioner also claimed ineffective assistance of appellate counsel because appellate counsel failed to raise certain claims and because counsel allegedly did not adequately argue the claims that were raised. On June 6, 2005, the Appellate Division denied petitioner's motion for a writ of error *coram nobis*. *People v. Archer*, 795 N.Y.S.2d 899 (N.Y. App. Div. 2005).

On June 23, 2005, petitioner applied for leave to appeal the denial of his *coram nobis* motion to the New York Court of Appeals. On August 22, 2005, the Court of Appeals denied petitioner's application for leave to appeal. *People v. Archer*, 836 N.E.2d 1155 (N.Y. 2005).

On October 4, 2005, Archer petitioned this Court for a writ of *habeas corpus*.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of *habeas corpus*, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

## III. DISCUSSION

### A. Procedural Default

As a threshold matter, respondent argues that petitioner's claim regarding sufficiency of the evidence as it pertains to establishing the elements of depraved indifference murder is procedurally barred from review. The Court agrees. As set forth below, this claim should be deemed exhausted but procedurally barred because petitioner failed to raise it on direct appeal. In any event, even assuming *arguendo* that this claim is reviewable, it is without merit for the reasons discussed *infra*.

Before a federal court can consider a petition for a writ of *habeas corpus*, the petitioner must have exhausted all available state judicial remedies. 28 U.S.C. 2254(b)(1); *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Exhaustion of state remedies requires that a petitioner "'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Duncan*, 513 U.S. at 365 (some quotation marks omitted) (quoting *Picard*, 404 U.S. at 275). "[I]t is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard*, 404 U.S. at 275-76. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see Duncan*, 513 U.S. at 365-66. "A petitioner has

'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982))); *see also Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at 191). However, "it is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citing *Picard*, 404 U.S. at 277, and *Gayle v. Le Fevre*, 613 F.2d 21 (2d Cir. 1980)). State courts have been given a reasonable opportunity to pass on the federal *habeas* claim if the legal basis of the claim made in state court was the "substantial equivalent" of that of the *habeas* claim. *Picard*, 404 U.S. at 278; *see also County Ct. of Ulster County v. Allen*, 442 U.S. 140, 149 (1979); *Gayle*, 613 F.2d at 22 n. 2; *United States ex rel. Gibbs v. Zelker*, 496 F.2d 991, 993-94 (2d Cir. 1974). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye*, 696 F.2d at 192. "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191-92 (citing *Picard*, 404 U.S. at 276 and *United States ex rel. Cleveland v. Casscles*, 479 F.2d 15, 19-20 (2d Cir. 1973)). "Likewise, the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." *Id.* at 192 (citing *Picard*, 404 U.S. at 276, *Callahan v. Le Fevre*, 605 F.2d 70, 72 (2d Cir. 1979), *Wilson v. Fogg*, 571 F.2d 91, 92-93 (2d Cir. 1978), and *Fielding v. Le Fevre*, 548 F.2d 1102, 1107 (2d Cir. 1977)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* (footnote omitted).

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (additional citations omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989) and *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). Therefore, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Keane*, 118 F.3d at 139 (quoting *Hoke*, 933 F.2d at 120 (quoting *Harris*, 489 U.S. at 263 n.9)). However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding."

*Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996), and *Coleman*, 501 U.S. at 744-51). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Netherland*, 518 U.S. at 162 (citations omitted).

In the instant case, following his conviction, petitioner filed a direct appeal to the New York Appellate Division. In his brief to the Appellate Division, petitioner raised the following issues: (1) ineffective assistance of trial counsel; (2) violation of petitioner's right against double jeopardy; and (3) excessive sentence. By *pro se* supplemental brief, petitioner also raised a claim of improper summation and raised three other claims that collectively challenged the legal sufficiency of the evidence as it relates to Bethune as a sole occurrence witness. In petitioner's brief to the New York Court of Appeals, which was subsequently denied, the only issues petitioner requested review of were: (1) ineffective assistance of trial counsel; (2) violation of petitioner's right against double jeopardy; and (3) all claims raised in the *pro se* supplemental brief to the Appellate Division. Petitioner failed to raise his claim of legally insufficient evidence of depraved indifference murder on direct appeal, in his motion to vacate the judgment, or in his *coram nobis* motion. This claim was never presented to the lower court, the Appellate Division, or the Court of Appeals for review.[11] The claim that petitioner now

asserts was reviewable from the record at the time of direct appeal. However, it was never raised during this time. A petitioner for federal *habeas corpus* relief procedurally defaults his claim by not raising it on direct appeal. *Id.; see also Graham v. Costello*, 299 F.3d 129, 133 (2d Cir. 2002). Because petitioner no longer has any state remedies available to him for that specific claim, which occurs when a petitioner has defaulted his federal claim in state courts, he meets the technical requirements for exhaustion. *Coleman*, 501 U.S. at 732. Thus, petitioner's claim of insufficiency of the evidence of depraved indifference murder is deemed exhausted under 28 U.S.C. § 2254(b) because petitioner no longer has remedies available in the New York state courts. However, petitioner's claim is also procedurally forfeited because he did not raise them on direct appeal, although there was a sufficient factual record to permit such review. *Hoke*, 933 F.2d at 121. Accordingly, because when a petitioner's claim is procedurally barred, federal *habeas* courts also must deem

---

[11] Although petitioner did raise a claim of legal insufficiency of evidence on direct appeal to both the New York Appellate Division and the New York Court of Appeals, that claim pertained to the credibility of a witness (Bethune), not to the evidence of depraved indifference murder. (*See Pro-Se* Supplemental Br.) However, in petitioner's application to the New York Court of Appeals, petitioner argues that "[i]n any event, Bethune testified that shooter ran to passenger [] side of car and shot passenger in head, showing willful intent to kill, thus not sufficient of Depraved Indifference Murder." (*See* Respondent's Mem. of Law, at 4.) To the extent that this one sentence raises the claim of insufficiency of evidence relating to depraved indifference murder, petitioner's claim is still procedurally barred because it was not first raised with the New York Appellate Division. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Ellman v. Davis*, 42 F.3d 144, 148 (2d Cir. 1994), *cert. denied*, 515 U.S. 1118 (1995). In any event, the Court, in an abundance of caution, addresses the merits of both legal insufficiency claims below and finds them to be without merit.

the claim procedurally defaulted, *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003), petitioner is not entitled to have this claim entertained in a federal *habeas* proceeding unless the requirements set forth below are satisfied.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 749-50 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases – for example, where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495 (1986). Here, petitioner has provided no explanation for his failure to raise this claim in his direct appeal to the Appellate Division and the New York Court of Appeals, nor has he demonstrated that a fundamental miscarriage of justice would occur if this claim were not reviewed by the *habeas* court. The evidence presented at trial clearly established petitioner's guilt beyond a reasonable doubt. To the extent petitioner argues that a miscarriage of justice will result if his claim is not reviewed because he is actually innocent of depraved indifference murder, the Court rejects that argument and finds, as discussed in detail *infra*, that the evidence presented at trial clearly established petitioner's guilt beyond a reasonable doubt. *See King v. Artus*, No. 06-2820-pr, 2008 WL 41059, at *2 (2d Cir. Jan. 2, 2008) (summary order).

Accordingly, petitioner's claim is deemed to be exhausted but procedurally barred from review by this Court. *See, e.g., Soto v. Conway*, 565 F. Supp. 2d 429, 436 (E.D.N.Y.

2008) (finding sufficiency of evidence claim involving conviction for depraved indifference murder was not properly preserved in state court and is procedurally barred on *habeas* review); *Alexander v. Graham*, No. 07-CV-59 (NG), 2008 WL 4239167, at *3-*4 (E.D.N.Y. Sept. 11, 2008) (finding sufficiency of evidence claim regarding depraved indifference murder to be procedurally defaulted where trial counsel failed to contemporaneously raise that claim at trial). In any event, assuming *arguendo* that this claim is reviewable, it is substantively without merit, as set forth *infra*.[12]

## B. Insufficient Evidence Claims

Petitioner claims that he was deprived of a fair trial and due process because there was insufficient evidence to prove his guilt beyond a reasonable doubt. Specifically, petitioner

---

[12]    Respondent also argues that certain of petitioner's claims relating to prosecutor's improper summation, discussed *infra*, were not properly preserved for appellate review. The Court disagrees for two reasons. First, the New York Appellate Division did not deny the petitioner's improper summation claim based on a state procedural bar – *i.e.*, unpreserved for appellate review – but instead, denied such claim on the merits. *See People v. Archer*, 784 N.Y.S.2d at 568 ("The defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit."). Second, the Second Circuit has held that "when a state court uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000) (citation omitted). Therefore, the Court addresses all of petitioner's improper summation claims on the merits and, as set forth below, finds them to be similarly unavailing.

argues that (1) Bethune's testimony was perjurious, and (2) the evidence at trial was insufficient to support a finding of depraved indifference murder. For the following reasons, this Court finds that there was sufficient evidence for a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find petitioner guilty beyond a reasonable doubt of the charges for which he was convicted.

The law governing *habeas* relief from a state conviction based on insufficiency of evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997). As such, a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vassell v. McGinnis*, No. 04 Civ. 0856 (JG), 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Flowers v. Fisher*, No. 06-5542-pr, 2008 U.S. App. LEXIS 22569, at *3 (2d Cir. Oct. 21, 2008) (*habeas* petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt") (quoting *Jackson*, 433 U.S. at 324); *Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) ("'[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2554 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'") (quoting *Jackson*, 443

U.S. at 324) (alteration in original); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume − even if it does not affirmatively appear in the record − that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994). Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Sanford v. Burge*, 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994)). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

### 1. Evidence Regarding Bethune's Testimony

Petitioner argues that he was convicted solely on Bethune's trial testimony, which petitioner alleges was perjurious and, therefore, insufficient to warrant a conviction. The Court disagrees and finds that there was sufficient evidence to support the trial court's determination that Bethune's testimony at trial was credible and that Bethune's recantation was an attempt of fraud on the court.

First, petitioner's attack on the credibility of Bethume as a witness at trial does not warrant *habeas* relief. It is well established

that a *habeas* court may neither "disturb the jury's findings with respect to the witnesses' credibility," *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony." *Fagon v. Bara*, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) (citing *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989)). Thus, a federal *habeas* court must "resolve all issues of credibility[] in favor of the jury's verdict." *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998); *accord Anderson v. Senkowski*, No. 92 Civ. 1007, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992), *aff'd*, 992 F.2d 320 (2d Cir. 1993); *see also Copeland v. Walker*, 258 F. Supp. 2d 105, 120 (E.D.N.Y. 2003) ("[C]redibility determinations are exclusively the domain of the trier of fact."); *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001) (holding that federal *habeas* courts "'are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony . . . [a federal *habeas* court] must presume that the jury resolved any questions of credibility in favor of the prosecution'") (quoting *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996)).

With respect to the testimony presented at the trial, the jury fully credited Bethune's testimony. Upon review of the record, the Court concludes that a jury could rationally have credited Bethune's testimony that petitioner shot Niles. The evidence at trial showed that Bethune was familiar with petitioner and had an adequate opportunity to view petitioner during the crime. Moreover, the evidence of the damage to the car and the bullet wound in the decedent's head corroborated Bethune's account that the gun shots came from the right side of the car. The testimony also established that petitioner had a

motive for shooting at Bethune based upon their confrontations the day before, and the day of, the shooting. Viewing the evidence in a light most favorable to the prosecution, the jury fully credited the witnesses and gave full weight to the testimony at trial. There is no basis to disturb those findings on *habeas* review. Therefore, in the instant case, petitioner's challenge to the witness' credibility during the trial cannot support a claim of legal insufficiency on *habeas* review.

Moreover, to the extent petitioner suggests that the evidence must be insufficient because petitioner was only identified by one eyewitness, the Court finds that argument unpersuasive. Although petitioner argues that his conviction was based solely on Bethune's testimony and identification, the Second Circuit has emphasized that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979), *cert. denied*, 441 U.S. 951 (1979); *see also Bentley v. Scully*, 41 F.3d 818, 825 (2d Cir. 1994) (stating that eyewitness testimony and identification constituted a major portion of overwhelming evidence of guilt); *King v. Greiner*, 210 F. Supp. 2d 177, 185 (E.D.N.Y. 2002) (holding that a petitioner's claim of legally insufficient evidence lacked merit in light of eyewitness identification); *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001) (holding that the testimony of one eyewitness defeated a petitioner's claim of legally insufficient evidence).

Second, petitioner's claim that the sufficiency of the evidence was undermined by the post-trial hearings relating to Bethune's recantation (which Bethune later repudiated), is also without merit. As a threshold matter, it is well-recognized that recantations must be "looked upon with the utmost suspicion."

*Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (quoting *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir. 1988)). Here, Bethune recanted certain trial testimony only after the trial concluded. Moreover, Bethune subsequently repudiated the recantation, where Bethune testified that Reynaldo induced Bethune to recant his testimony against petitioner in exchange for Michael Archer not testifying against Reynaldo in connection with a separate crime. (H4. at 24-26, 113-117.) The fact that Bethune repudiated the recantation further undermines the reliability of such a recantation. *See United States v. Lespier*, 266 Fed. Appx. 5, 2008 WL 116294, at *2 (2d Cir. Jan. 11, 2008) ("We have . . . emphasized that a district court should give little evidentiary weight to a recantation affidavit that has since been repudiated."); *United States v. Gallego*, 191 F.3d 156, 166 (2d Cir. 1999) (stating that a "recanted recantation . . . can only be reviewed with extreme skepticism"), *cert. denied*, 530 U.S. 1216 (2000), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004); *see also United States v. Schlesinger*, 438 F. Supp. 2d 76, 103 (E.D.N.Y. 2006) (holding that a recantation, once repudiated, is no longer substantive evidence that may be used at a new trial, but can only be used as impeachment evidence for the purpose of cross-examining the witness).

The Court recognizes that "a determination that [a witness's] recantation was not credible is insufficient [in itself] to establish that [the witness's] trial testimony was not perjured." *Ortega*, 333 F.3d at 107 (granting *habeas corpus* relief where trial court limited its inquiry solely to the credibility of the recantation without taking into account the credibility of the testimony at trial). However, *Ortega* is distinguishable from the instant case for two reasons. First, the facts in *Ortega* did

not deal with a repudiation of a recantation, as were the facts here. Bethune's repudiation further undermines the strength of such a recantation, which is already "looked upon with the utmost suspicion." *Ortega*, 333 F.3d at 107. Second, in limiting its inquiry to the recantation, the district court in *Ortega* did not weigh all of the evidence of perjury before it prior to reaching a conclusion. In the instant case, the Court finds that there is more than sufficient evidence from which the state court (after conducting a post-trial hearing) found the trial testimony to be credible, taking into account not only the trial testimony, but also the recantation, its surrounding circumstances, and the repudiation of such a recantation. The record clearly demonstrates that Reynaldo and Michael Archer entered into an agreement under which Reynaldo would induce Bethune to recant his testimony against petitioner in exchange for Michael Archer not testifying against Reynaldo in connection with a separate crime for which Reynaldo was charged (namely, shooting Michael Archer, petitioner's brother, in retaliation). The trial court looked at all of these circumstances and found sufficient evidence to conclude that Bethune's recantation was the result of a fraudulent attempt to secure the release of petitioner. Specifically, the trial court accepted the testimony of Bethune and Reynaldo at the reopened hearing, which was corroborated by a tape recording. (H5. at 41.) As such, the trial court's findings that Bethune's trial testimony was truthful and that his post-hearing recantation was false were properly supported by the record, and there is no basis to disturb that finding or the jury's verdict. *See generally United States v. Lespier*, 266 Fed.Appx. 5, 2008 WL 116294, at *2 (2d Cir. Jan. 11, 2008) ("While it is possible that [the witness's] now-repudiated recanting affidavit may have some evidentiary value, it lay within the discretion of the District Court to determine

whether this evidence proved that [the witness's] trial testimony was false.").

In sum, this Court, as the Second Circuit cautioned in *Ortega*, has not simply concluded that the state court properly found that the recantation was not credible, but rather has carefully analyzed the entire state court record to ensure that there is no other evidence that provides a basis to conclude (or even raise a question as to whether) Bethune's trial testimony was perjured. That careful review by this Court has uncovered no credible evidence to suggest that Bethune's trial testimony was false, and there is simply no basis to question the state court's decision on that issue. Accordingly, the Court finds that petitioner's claim of insufficient evidence with regards to Bethune's testimony does not provide a basis for *habeas* relief.

### 2. Evidence of Depraved Indifference Murder

Petitioner also argues that there was insufficient evidence to convict him of depraved indifference murder beyond a reasonable doubt because the only view of the evidence was that petitioner acted with an intent to kill, not with depraved indifference.[13] As set forth below, the Court disagrees.

New York depraved indifference murder law is defined as follows: "Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct

which creates a grave risk of death to another person." N.Y. Penal Law § 125.25(2). "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." N.Y. Penal Law § 15.05(3).[14]

"[I]t has never been permissible in New York for a jury to convict a defendant of depraved indifference murder 'where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim.'" *Policano v. Herbert*, 507 F.3d 111, 114-15 (2d Cir. 2007) (quoting *Policano v. Herbert*, 7 N.Y.3d 588, 600 (N.Y. 2006) (explaining issues certified by the Second Circuit)).

Petitioner argues that the evidence at trial could only sustain a conviction for intentional

---

[13] As a threshold matter, the Court finds this claim to be procedurally barred from review by this Court, as discussed *supra*. However, in an abundance of caution, the Court will analyze the merits of this claim. Even assuming *arguendo* that this claim is reviewable, it is substantively without merit, as set forth below.

[14] As one court has noted, when these statutes are read in conjunction with each other, "[t]he statutory standard for recklessness is higher for depraved indifference murder than for other reckless crimes. The depraved indifference murder statute requires that the risk created by a defendant's conduct be 'grave,' in addition to being substantial and unjustifiable." *Flowers v. Fisher*, No. 03 CV 5405 (NG) (VVP), 2006 WL 3050876, at *12 n.4 (E.D.N.Y. Oct. 23, 2006) (citations omitted), *aff'd*, 2008 WL 4643911 (2d Cir. Oct. 21, 2008) (summary order).

14

murder and, therefore, was insufficient to establish depraved indifference murder. In support of his argument, petitioner relies on cases decided after his trial in 1999, which were part of the fundamental shift in New York's homicide jurisprudence in which defendants involved in one-on-one confrontations with victims could not be convicted of depraved indifference murder except in unusual circumstances. *See People v. Suarez*, 6 N.Y.3d 202, 208-09 (N.Y. 2005); *People v. Payne*, 3 N.Y.3d 266 (N.Y. 2004); *People v. Gonzalez*, 1 N.Y.3d 464, 467 (N.Y. 2004); *People v. Hafeez*, 100 N.Y.2d 253, 258 (N.Y. 2003). The evolution of New York law with respect to the depraved indifference statute is discussed in detail in *Rustici v. Philips*, 497 F. Supp. 2d 452, 483 (E.D.N.Y. 2007) and *Guzman v. Greene*, 425 F. Supp. 2d 298, 313 (E.D.N.Y. 2006), but a brief summary of the developments under New York law in connection with this statute is warranted.

### a. New York's Depraved Indifference Statute

At the time of petitioner's trial in 1999, the law as stated in *People v. Register* (and later reiterated in *People v. Sanchez*) was controlling.[15] *See Rustici*, 497 F. Supp. 2d at 483. Recklessness was the required mental state for depraved indifference murder and the depravity and indifference was assessed objectively based on a review of the circumstances of the crime. *See People v. Register*, 60 N.Y.2d 270, 273-75 (N.Y. 1983) (upholding conviction for depraved indifference murder where defendant entered a crowded bar with a pistol, drank for several hours stating that he was "'going to kill somebody tonight,' or similar words," then later shot at close range a person who had been arguing with his friend, shot a second person by mistake, and shot a third person for no explained reason), *overruled by People v. Feingold*, 7 N.Y.3d 288 (N.Y. 2006); *see also People v. Sanchez*, 98 N.Y.2d 373, 381-82 (N.Y. 2002) (upholding conviction for depraved indifference murder when defendant fired a gun pointed at the victim's chest from a distance of twelve to eighteen inches and then fled), *overruled by People v. Feingold*.

During this time of the *Register/Sanchez* line of cases, the New York Court of Appeals held that it was not inappropriate for the trial court to let the jury decide whether defendants should be convicted of intentional or depraved indifference murder. *Sanchez*, 98 N.Y.2d at 384 (asking "whether, on this record, based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of causing death from defendant's conduct was so obviously severe that it evinced a depraved indifference to human life"). The Court of Appeals reasoned that "purposeful homicide itself is the ultimate manifestation of indifference to the value of human life," *id.* at 384, and that the jury could "reasonably have concluded that defendant's conduct was either reckless and depraved, or intentional." *Id.* at 386; *see also id.* at 378 (noting that "the jury may also have taken into account the preexisting good relations between defendant and [the victim], and concluded that this was an instantaneous, impulsive shooting – perhaps to disable or frighten [the victim], rather than to kill him").

The Second Circuit has similarly found these cases during this time to stand for the proposition that "the evidence may be sufficient to support a conviction for depraved

---

[15] Although *People v. Sanchez* was not yet decided at the time of petitioner's trial, the law from *Register* was still the controlling standard at the time *Sanchez* was decided.

indifference murder if the jury could rationally infer that the defendant did not act with intent to kill the victim even if it might, on the same facts, properly conclude that the murder was intentional." *Policano*, 430 F.3d at 91.

However, there have been significant developments in New York regarding the law of depraved indifference murder and the legal sufficiency of evidence supporting such a claim since *Register* and *Sanchez*. *See Rustici*, 497 F. Supp. 2d at 484-86 (discussing developments in New York law regarding the depraved indifference statute and sufficiency of evidence); *see also Guzman*, 425 F. Supp. 2d at 307-13 (same). In *Register*, the court held that recklessness is the *mens rea* for depraved indifference murder. 60 N.Y.2d at 277. Beginning in 2003, however, several cases began restricting the circumstances under which a defendant could be found guilty of depraved indifference murder. *See e.g., People v. Suarez*, 6 N.Y.3d 2002 (N.Y. 2005); *People v. Gonzalez*, 1 N.Y.3d 464 (N.Y. 2004); *People v. Payne*, 3 N.Y.3d 266 (N.Y. 2004); *People v. Hafeez*, 100 N.Y.2d 253 (N.Y. 2003). Specifically, in *Suarez*, the Court of Appeals stated:

> [S]omeone who intends to cause serious physical injury does not commit depraved indifference murder because the intended victim dies . . . . Thus, one who acts with the conscious intent to cause serious injury, and who succeeds in doing so, is guilty only of manslaughter in the first degree. Otherwise, every intentional manslaughter would also establish depraved indifference murder – a result plainly at odds with the discrete classifications set forth in the statute. Since a defendant who intends to injure or kill a particular person cannot

generally be said to be "indifferent" – depravedly or otherwise – to the fate of that person, we underscore what we said in Payne: *"a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder."*

6 N.Y.3d at 211-12 (emphasis added).

Moreover, in 2006, the New York Court of Appeals in *People v. Feingold*, 7 N.Y.3d 288, 292 (N.Y. 2006) re-examined its depraved indifference jurisprudence and explicitly overruled *Sanchez* and *Register*. In doing so, the Court of Appeals held that depraved indifference is a culpable mental state. *Feingold*, 7 N.Y.3d at 294. Specifically, the Court of Appeals explained:

> We say today explicitly what the Court in *Suarez* stopped short of saying: depraved indifference to human life is a culpable mental state. Our dissenting colleagues contend that this final step in the overruling of *Register* is unwarranted and unnecessary. Perhaps we would agree with that were it not for the setting in which the present case comes to us. In earlier cases (*Hafeez, Gonzalez, Payne, Suarez*), we reversed depraved indifference murder convictions without having to discuss explicitly the question of mens rea. It was enough to say – and we said it repeatedly – that those defendants did not commit depraved indifference murder because depravity or indifference was lacking. Beginning with *Hafeez*, the *Register/Sanchez* rationale was progressively weakened so that it would no longer support most depraved indifference murder convictions, particularly one-on-one

shootings or stabbings . . . . In *Suarez*, it was not necessary for us to state explicitly whether depraved indifference is a mental state (mens rea). In the case before us, however, the trial judge rendered his verdict in a way that requires us to address directly the question of mens rea.

*Feingold*, 7 N.Y.3d at 294 (footnote omitted). Applying this *mens rea* requirement, the *Feingold* Court held that the conviction could not stand because the factfinder determined that the defendant did not act with depraved indifference. *Id.* at 295.

Thus, as the New York Court of Appeals explained in a subsequent decision in 2006, the interpretation of this element – namely, "under circumstances evincing a depraved indifference to human life" – of the depraved indifference murder statute "gradually and perceptibly changed from an objectively determined degree-of-risk standard (the *Register* formulation) to a mens rea, beginning with our decision in *Hafeez* in 2003, continuing in our decisions in *Gonzalez, Payne* and *Suarez* in 2004 and 2005, and ending with our decision in *Feingold* in 2006." *Policano*, 7 N.Y.3d at 602-03.

b. Application of New York's Depraved Indifference Statute to the Instant Case

With respect to petitioner's challenge in the instant case to the sufficiency of the evidence supporting the conviction for depraved indifference murder, this Court must look to New York law as it existed at the time petitioner's conviction became final. *See Williams v. Phillips*, No. 07-1411-pr, 2008 WL 5262317, at *1 n.2 (2d Cir. Dec. 18, 2008) ("The New York Court of Appeals currently applies a different interpretation of 'depraved

indifference' murder; however, we must apply the law as it existed at the time of petitioner's trial and direct appeal."); *Flowers v. Fisher*, No. 06-5542-pr, 2008 U.S. App. LEXIS 22569, at *3 (2d Cir. Oct. 21, 2008) ("We look to New York law as it existed at the time [petitioner's] conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively.") (citing *Policano*, 859 N.E.2d at 495). The conviction becomes final 90 days after the New York Court of Appeals denies leave to appeal – that is, after the period during which a litigant can petition the United States Supreme Court for a writ of certiorari ends. *See Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005). In the instant case, petitioner's conviction became final in March 2005 and, thus, the sufficiency of the evidence must be examined by New York law at that time – as outlined by the New York Court of Appeals in *Hafeez, Payne*, and *Gonzalez*.

Under the law at the time of *Hafeez*, after a careful review of the record, the Court concludes that a rational factfinder, viewing the evidence in the light most favorable to the prosecution and drawing all permissible inferences in the prosecution's favor, could have found the elements of depraved indifference murder satisfied beyond a reasonable doubt – namely, that petitioner's action was so reckless as to create a very high risk of death. Specifically, the evidence at trial showed that, on the night of the shooting, Archer fired several shots into a car in quick succession before the car was able to speed away. (Tr. at 31, 42-45, 200.) The shooting was not a one-on-one confrontation, but instead, one of the shots killed Niles while another shot nearly hit Bethune, the driver. (Tr. at 31, 34-30, 125.) Moreover, the evidence showed no previous or current

disputes between Archer and Niles. Rather, the evidence at trial indicated that Archer, Bethune, and Reynaldo were in a dispute, and that several confrontations that week between Archer and Bethune took place. These facts raise the inference that defendant was indifferent about who was in the car (other than Bethune) when firing those shots and randomly fired without a specific intent to kill.

Petitioner relies on *Hafeez, Gonzalez,* and *Payne* – decided during his direct review – in arguing that his shooting constituted intentional murder, not depraved indifference. The Court disagrees, finding that the factual circumstances that distinguished these cases from the *Register/Sanchez* line of cases are not present in the instant case.

In *People v. Hafeez,* the defendant was convicted of depraved indifference murder for aiding and abetting his co-defendant's revenge killing, where the co-defendant lured the victim into a bar and stabbed the victim in the chest. The Appellate Division reversed the conviction for depraved indifference murder, and the New York Court of Appeals affirmed such a reversal. In doing so, the Court of Appeals held:

> The trial evidence concerning codefendant's conduct was consistent with intentional murder as opposed to depraved indifference murder. Here, codefendant plotted his revenge for months in advance and effectuated his plan on the night of the stabbing by a scheme intended to place the victim in a position where he would be vulnerable to attack. Codefendant concealed a knife in his sleeve poised to slip into

> his hand. The plan culminated in a single deliberate wound to the chest that perforated the victim's heart. It was a quintessentially intentional attack directed solely at the victim.

*Hafeez,* 762 N.Y.S.2d at 575 (internal citation omitted). The Court of Appeals concluded that defendant's acts were not "imminently dangerous and [did not] present[] a very high risk of death to others." *Id.* The court contrasted the circumstances in *Hafeez* with *Sanchez,* finding that the defendant in *Sanchez* presented a heightened risk of unintended injury by firing in an area where children were playing. *Id.* The court concluded that "there exist[ed] no valid line of reasoning that could support a jury's conclusion that defendant possessed the mental culpability required for depraved indifference murder." *Id.*

Similarly, in *People v. Gonzalez,* the New York Court of Appeals agreed with the Appellate Division for concluding that "defendant was guilty of an intentional shooting or no other." 775 N.Y.S.2d 224, 226 (N.Y. 2004). The evidence at trial showed that defendant "shot the victim once in the chest, once in the face from 6 to 18 inches away, six times in the back of the head from approximately six inches away, and twice in the back." *Id.* The Court of Appeals concluded that "[t]he only reasonable view of the evidence here was that defendant intentionally killed the victim by aiming a gun directly at him and shooting him 10 times at close range, even after he had fallen to the ground." *Id.* In defining depraved indifference murder, the court stayed that "it involves a killing in which the defendant does not have a conscious objective to cause death but instead is recklessly indifferent, depravedly so, to

whether death occurs. When defendant shot his victim at close range, he was not recklessly creating a grave risk of death, but was creating a virtual certainty of death born of an intent to kill." *Id.* at 227.

Finally, in *People v. Payne*, the defendant, angry after a phone confrontation with the victim, loaded a 12-gauge shotgun, went to the victim's home and shot him at point-blank range, killing him. 3 N.Y.3d 266, 269 (N.Y. 2004). The Court of Appeals, in reversing defendant's conviction for depraved indifference murder, analogized this case to *Gonzales*, concluding that "the evidence established defendant's intent to kill" rather than "[i]ndifference to the victim's life." *Id.* at 270.

These cases relied upon by petitioner clearly show that the New York Court of Appeals began limiting those circumstances under which a defendant could be charged with depraved indifference murder – specifically with respect to individual, one-on-one shootings or knifings. The Court recognizes that the instant case is not factually identical to the depraved indifference situations discussed in *Gonzales* (and emphasized in *Payne*), where a defendant clearly lacks the intent to kill but was oblivious to the consequences and acted with a depraved indifference to human life. *See Gonzales*, 775 N.Y.S.2d at 226-27 ("Depraved indifference murder is exemplified by a defendant – unconcerned with the consequences – who fires into a crowd; drives an automobile down a crowded sidewalk at high speed; shoots a partially loaded gun at a person's chest during a game of Russian roulette; abandons a helplessly intoxicated person on a snowy highway at night; or repeatedly beats a young child over a period of several days."); *see also Payne*, 3 N.Y.3d at 271-72 ("Instances [of depraved indifference murder] include where, without the intent to kill, the defendant inflicted a continuous beating on a three-year-old child, fractured the skull of a seven-week-old baby, repeatedly beat a nine year old or robbed an intoxicated victim and forced him out of a car on the side of a dark, remote, snowy road partially dressed and without shoes in subfreezing temperatures.") (internal citations omitted).

However, unlike the cases petitioner cites to, the instant killing was not directed at a single individual. *Cf. Hafeez*, 762 N.Y.S.2d at 575 (direct stabbing of the deceased); *Gonzales*, 775 N.Y.S.2d at 224 (direct shooting of the deceased); *Payne*, 3 N.Y.3d at 266 (direct shooting of the deceased). As discussed above, petitioner rapidly fired into a car containing both the deceased and Bethune. Even if he intended to kill Bethune, his erratic shooting – with one shot hitting Niles and one nearly hitting Bethune – indicates a reckless disregard for life because petitioner clearly put another at risk (*i.e.*, Niles). *See Hafeez*, 762 N.Y.S.2d at 259 (concluding that the "burden [for depraved indifference murder] was met in *Sanchez*, which involved the sudden shooting of a victim by a defendant who reached around from behind a door and fired into an area where children were playing, presenting a heightened risk of unintended injury"); *see also Payne*, 3 N.Y.3d at 272 ("Absent the type of circumstances in, for example, *Sanchez* (*where others were endangered*), a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder.") (emphasis added).

Furthermore, there was no evidence indicating prior animosity towards the deceased, or that petitioner intended to kill him for any reason. If anything, the evidence at trial showed that petitioner had prior confrontations with Bethune, not the deceased.

A rational juror could reasonably conclude that petitioner showed reckless disregard, or depraved indifference, to the other individual in the car, and that the decedent was an innocent bystander. New York courts, after *Hafeez, Payne,* and *Gonzalez,* have continued to find sufficient evidence to support a depraved indifference murder under analogous factual circumstances. For example, in *People v. Campbell,* 33 A.D.3d 716 (N.Y. App. Div. 2006), the Second Department held that the evidence was sufficient to support depraved indifference murder where the defendant exchanged words (asking about a man named "Born") with the decedent's cousin, in the presence of the decedent and one other individual, and then fired shots at all three as they fled when they saw the defendant reach for a gun:

> At bar, there was no evidence of any dispute between the defendant and the decedent, that the defendant even knew the decedent, or was provoked before he shot and killed the decedent. Rather, the decedent was simply in the company of two other men, including [his cousin], who testified he knew of "Born" and [the third individual], who recognized the defendant from high school. For reasons that were not established at trial, the defendant, after approaching the three men and having a brief conversation with [the decedent's cousin], pulled out a gun and fired it five times in the direction of the fleeing men. Under these circumstances, this case fits into the narrow category of cases where

depraved indifference murder properly applies.

*Id.* at 718-19; *see also People v. Carter,* 40 A.D.3d 1310, 1385 (N.Y. App. Div. 2007) ("While the mere presence of third persons at the scene of a killing does not convert an intentional homicide directed at a particular victim into depraved indifference murder unless others are actually endangered, and more shots generally connote an intent to kill, the circumstances here show that defendant was wildly shooting toward several people. [The victim who defendant had words with in the bar] and two companions had exited the bar and one was standing at the door when defendant began shooting, and the three remained outside until the shooting ceased. Defendant fired as many as eight shots, but only four hit [the above-referenced victim] . . . . These remaining projectiles and the ricocheting bullets could just as easily have hit someone other than [that victim].") (internal quotations and citations omitted); *People v. Jean-Baptiste,* 38 A.D.3d 418, 421 (N.Y. App. Div. 2007) (finding evidence sufficient for depraved indifference murder conviction where defendant brought a gun to a street brawl and noting "defendant's conduct in bringing a gun to a street brawl demonstrates a degree of wanton disregard and callousness toward the persons involved in the brawl"); *People v. Golden,* 37 A.D.3d 972, 973 (N.Y. App. Div. 2007) ("[O]ur review of the record convinces us that there was legally sufficient evidence to establish defendant's recklessness and depraved indifference to human life. Surely a jury was entitled to find that defendant's firing of a weapon into a darkened apartment where he should have perceived that one or more inhabitants were present was reckless conduct, and the jury likewise could infer from the evidence that defendant acted with an utter disregard for the value of human life – [acting]

not because [he intended] harm, but because [he] simply [didn't] care whether grievous harm [resulted] or not.") (quotations and citation omitted); *People v. Parker*, 29 A.D.3d 1161, 1162-63 (N.Y. App. Div. 2006) ("The evidence at trial established that defendant fired but a single shot across the street where several other people besides the victim were present after a night of drinking alcohol and smoking marihuana. Just minutes earlier, defendant and his companions had stolen two separate vehicles outside a nearby pizza shop, one of which belonged to the victim. Upon locating these vehicles outside the apartment of defendant's friend, the victim punched another of defendant's friends in the face, knocking him to the ground. It was then that the single shot was fired . . . . In short, this was not a preplanned revenge shooting or a one-on-one, point-blank shooting between feuding individuals, but a sudden and spontaneous act which endangered numerous people such that the verdict of depraved indifference, as opposed to an intentional killing, could have been reached.") (citations and footnotes omitted).

In sum, although the Court recognizes that the law regarding depraved indifference was narrowed during the time of petitioner's appeal, the instant case is not factually similar to those cases relied upon by petitioner limiting such law. Accordingly, the Court finds that a reasonable jury could still have found depraved indifference under the factual circumstances of this case, based upon the law at the time the petitioner's conviction became final in 2005.

### c. The Retroactivity Issue

To the extent petitioner argues that changes in the law reflected in New York cases decided after his conviction became final in March 2005 are applicable to the analysis in the instant case − *i.e.*, *Suarez* and *Feingold* − the Court disagrees. The New York Court of Appeals made clear in *Policano v. Herbert* that changes in New York's depraved indifference law are not to be applied retroactively on collateral review and that "nonretroactivity poses no danger of a miscarriage of justice." 7 N.Y.3d at 604. Thus, as noted above, this Court has applied the law as it existed at the time petitioner's conviction became final in March 2005, rather than under the law as set forth in *Suarez* and *Feingold*.

However, even assuming *arguendo* that these later cases could be applied to Archer's conviction, his insufficiency claim would still fail. In particular, even under current New York law, Archer's claim would fail because, as discussed *supra* − it was not a one-on-one shooting and there was sufficient evidence to find that, in shooting at Bethune, he recklessly caused Niles' death with the requisite depravity and indifference to human life. In other words, even after *Suarez* and *Feingold*, a shooting such as the one we have here − where petitioner fired several shots into a car with two individuals, but his dispute was with only one occupant − would still be valid. *See, e.g., Garcia v. Graham*, No. 07-CV-3790 (JG), 2008 WL 2949383, at *10 (E.D.N.Y. July 31, 2008) ("The evidence is entirely sufficient to allow a rational jury to conclude that [petitioner] solicited and aided his associate in retaliating against the individuals who assaulted [petitioner] by firing indiscriminately into a group of them. Indeed, while firing at a single individual at point-blank range will rarely constitute depraved indifference murder as opposed to intentional murder, firing into a group of individuals without regard for who is hit is a paradigm example of depraved indifference murder.") (citations omitted); *see also People v. Craft*, 36 A.D.3d 1145, 1148

(N.Y. App. Div. 2007) (finding evidence sufficient to support depraved indifference murder where defendant intended to shoot one individual and killed a second individual whom he did not intend to kill).

In sum, although the Court recognizes that the law regarding depraved indifference has evolved since petitioner's trial in 1999, the Court concludes that the evidence in this particular case was sufficient to sustain petitioner's conviction for depraved indifference under New York law at the time petitioner's conviction became final (and under current law). Therefore, assuming *arguendo* that the insufficiency claim is not procedurally barred from *habeas* review, the Court finds the evidence supports a depraved indifference conviction.

## C. Double Jeopardy

Petitioner argues that the state court violated his rights under the Double Jeopardy Clause of the Fifth Amendment. Specifically, he claims that the trial court erred by vacating the order to set aside the verdict and reinstating the verdict. For the reasons stated below, this Court holds that the trial court did not violate petitioner's double jeopardy rights.

It is well-established that, so long as there is a jury verdict of guilty, an appellate court may correct errors of law without subjecting a defendant to any constitutional deprivation. *See United States v. Jones*, 763 F.2d 518, 525 (2d Cir. 1985); *United States v. Zisblatt*, 172 F.2d 740, 743 (2d Cir. 1949). The Supreme Court has held that "[w]hen a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict

of guilty." *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005) (citing *United States v. Wilson*, 420 U.S. 332, 352-53 (1975)). Reinstatement of a jury's verdict is simply a correction of the trial court's legal error and does not violate double jeopardy rights since the petitioner will not be subjected to a second trial for the same offense. *Jones*, 763 F.2d at 518; *accord United States v. Wilson*, 420 U.S. 332 (1975).

Here, the trial court reinstated the jury's guilty verdict subsequent to its order vacating the verdict. As discussed above, reinstating a guilty verdict does not violate prohibitions against double jeopardy. The fact that the verdict was reinstated by the trial court on a motion for reconsideration, rather than on appeal, is immaterial. The effect of either a motion for reconsideration or an appeal is the same – *i.e.*, reinstatement of the verdict. *See generally* N.Y. C.P.L. 40.30[3]; *People v. Key*, 45 N.Y.2d 111, 117-20 (N.Y. 1978); *People v. Dorta*, 56 A.D.2d 607, 607 (N.Y. App. Div. 1977) (holding no violation of double jeopardy where verdict was reinstated on appeal). Neither a reconsideration motion nor an appeal to reinstate a guilty verdict require a new trial. Such a legal error by the trial court can be corrected by the entry of judgment on the verdict.

Accordingly, given that the prosecution's right to appeal an order setting aside the verdict does not violate a defendant's double jeopardy rights, the trial court's reinstatement of the verdict similarly did not violate petitioner's double jeopardy rights.[16]

---

[16] Petitioner also attempts to argue that the trial court's initial order setting aside the jury's guilty verdict and ordering a new trial is also in violation of petitioner's double jeopardy rights. This argument is similarly meritless. Under New York

## D. Prosecutorial Misconduct Claim

Petitioner also alleges that the prosecutor's remarks in the closing statement were improper and, therefore, petitioner was denied his right to a fair trial. (Petition, at 6.) First, petitioner argues that, in the prosecutor's summation, the prosecutor improperly bolstered the credibility of Bethune.[17] (Def.-Appellant's *Pro-Se* Supp. Br., at 25-26) (Respondent's Exh. D.) Second, petitioner complains that, in summation, the prosecutor denigrated the defense witnesses.[18]

Third, petitioner complains that the prosecutor improperly misled the jury into believing that the trial judge felt the defendant was guilty.[19] Fourth, petitioner complains that, in summation, the prosecutor mischaracterized the evidence.[20]

As set forth below, there is no basis to conclude that any of the allegedly improper remarks by the prosecutor in the closing statement warrant *habeas* relief, especially

---

State law, "reprosecution is permitted whenever a dismissal has been granted on motion by defendant so long as the dismissal does not constitute an adjudication on the facts going to guilt or innocence." *Key*, 45 N.Y.2d at 117; *see also* N.Y. C.P.L. § 40.30(3) (stating that when a court issues an order "which directs a new trial of the same accusatory instrument, the nullified proceedings do not bar further prosecution of such offense under the same accusatory instrument.") The trial court's order setting aside the verdict and directing a new trial based on newly-discovered evidence – *i.e.*, Bethune's recantation – is not the equivalent of an adjudication of factual innocence. *See generally* N.Y. C.P.L. §§ 40.30[3], 450.20[3]; *Key*, 45 N.Y.2d at 117-120; *People v. Dorta*, 56 A.D.2d 607, 607 (N.Y. App. Div. 1977). Therefore, ordering a new trial under these circumstances is not a violation of petitioner's double jeopardy rights, and the Appellate Division's rejection of such a claim was not an unreasonable application of clearly established federal law.

[17] Specifically, petitioner complains that the prosecutor stated: "Those are the reasons – look at his character, look at why you should believe him. Because Carlos Bethune has good character . . . . First of all ask yourself: what motive does he have to lie? There's absolutely nothing." (Tr. 493-94, 497.)

[18] In particular, petitioner points out that the prosecutor stated: "When you evaluate [Derrick St.

John's] credibility, look at the character and decide is that a person you are going to believe or is that a person that is coming in here to help out his good friend. We know he has at least one alias. He said, I have my brother's I.D., I just use it sometimes. Well, that goes to his character and that goes to whether or not he's being truthful or not. Oh, he has another date of birth also. Why does he have to go down and tell people he's not who he is. He has to use another name, another date of birth? He's not truthful those times, he's not truthful when it's convenient for him, he's not being truthful now . . . ." (Tr. 501.)

[19] Petitioner notes, as an example, that the prosecutor stated: "Now, the judge is going to give you some instructions at the end. He's going to tell you this is Murder in the Second Degree, Depraved Indifference. I submit to you that someone who fires into a car where there are people, is reckless and showing a depraved indifference." (Tr. 508.) Petitioner argues that this was the exact charge on which the jury convicted petitioner. (Def.-Appellant's *Pro-Se* Supp. Br., at 30.)

[20] For example, petitioner notes that the prosecutor stated: "[Petitioner] felt he needed to square off Carlos and Reynaldo by sticking his hand in his pocket. You heard that night that [petitioner] lifted up his shirt and said 'Tonight I don't have the gun.'" (Tr. 486.) He also argues that the prosecutor attempted to depict the defendant as "angry" or "upset" about the confrontations he had with Bethune. *(See* Def.-Appellant's *Pro-Se* Supp. Br., at 26) (Respondent's Exh. D.)

when considered in the context of the entire trial and in response to counsel for petitioner's closing argument.

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). For a claim of prosecutorial misconduct to suffice to establish a claim of constitutional error, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and quotation marks omitted). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). The Court must then review such comments by a prosecutor narrowly to determine whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

To overcome this burden, petitioner must show that he "'suffered actual prejudice because the prosecutor's comments during [testimony and/or] summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (quoting *Darden*, 477 U.S. at 181). Factors considered in

determining such prejudice include "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." *Id.*; *accord United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004).

In the instant case, the petitioner claims that the prosecution improperly bolstered her witnesses' credibility during summation, specifically Bethune. The Supreme Court has long recognized that "'[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.'" *United States v. Young*, 470 U.S. 1, 8 (1985) (quoting ABA standards for Criminal Justice 3-5.8(b) (2d ed. 1980)); *accord United States v. Nersesian*, 824 F.2d 1294, 1328 (2d Cir. 1987). However, a reviewing court "must evaluate the challenged remarks in the context of the trial as a whole, for the government is allowed to respond to argument that impugns its integrity or the integrity of its case." *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994).

Under New York law, a comment that a witness has no motive to lie does not constitute vouching for the witness's credibility. *See, e.g., People v. Evans*, 192 A.D.2d 671, 672 (N.Y. App. Div. 1993) (holding that remarking on witness's lack of motive to lie is proper or does not constitute vouching); *People v. Franklin*, 188 A.D.2d 662, 662 (N.Y. App. Div. 1992) (same); *People v. Lucas*, 162 A.D.2d 273, 274 (N.Y. App. Div. 1990) (same); *People v. Stephens*, 161 A.D.2d 740, 741 (N.Y. App. Div. 1990) (same); *People v. Cox*, 161 A.D.2d 724, 725 (N.Y. App. Div. 1990) (same); *People v. Glenn*, 140 A.D.2d 623, 623 (N.Y. App. Div. 1988) (same). Here, in her summation, the prosecutor did not

improperly vouch for witnesses, but merely suggested that the prosecution witnesses had no motive to lie.

Moreover, the prosecutor merely responded to defense counsel's arguments during his own summation, including defense counsel's own speculation on the credibility of Bethune and other witnesses. Specifically, in summation, defense counsel told the jury that Bethune was lying to them. For example, in the summation, petitioner's counsel stated,

> Remember in voir dire we talked about a witness could be telling the truth, they could be mistaken. Well, now at this point in the trial, we know from the evidence that [Bethune] took an oath and stood here and he lied to you. Over and over and over again.

Petitioner's counsel then went through a long list of alleged lies by Bethune. Petitioner's counsel also argued,

> Why is it important for him not to tell us that? Not to tell you that? Because he doesn't want to be pressed on details about the incident. And his thinking is that, when I'm asking him questions he has to be uncooperative, evasive and untruthful. But when [the prosecutor] asks him questions, he will try to comply. He doesn't know where I am going with my questions. He just knows that the best approach is not to answer. Do I have to answer that question? No, Mr. Bethune, you don't have to answer any question. None at all. And this was – this was a great one, wasn't it, ladies and gentlemen.

(Tr. 478-79.)  Petitioner's counsel further argued,

And as [Bethune] was pressed over and over, on cross-examination, for details about the shooting, the color of the car, the race of the man with the cell phone, the color of the mini van, describe the gun, detail after detail, he was asked and unable to provide. Till, finally, he got to the point, and you observed him, you saw his rage, you saw his venom . . . Well, Mr. Bethune, we don't expect you to describe the gun. We don't expect you to describe the shooter. Because we understand you didn't see those things.

(Tr. 469-70.)  In her own summation, the prosecutor essentially responded to – and attempted to rebut – claims made by petitioner's counsel in summation that attempted to undermine the prosecution witnesses' testimony, which was entirely proper.

The petitioner also complains that the prosecutor denigrated the defense witnesses in summation. However, the record shows that the prosecutor only pointed out the evidence that came out during trial – including their backgrounds, their relationships to the defendant, and the contradictions and inconsistencies within and among their respective testimony – to show that the defense witnesses were not credible. Moreover, as discussed above, the prosecutor's summation was responsive to the comments made during the defense summation that such witnesses were more credible than the prosecution witnesses.

Similarly, the prosecutor did not engage in any misconduct by stating that the trial judge was going to instruct the jury on Murder in the Second Degree, Depraved Indifference, and then arguing to the jury that firing into the car

satisfied the elements of that crime. There is certainly nothing improper with such a statement.

Finally, with respect to the petitioner's arguments that the prosecutor mischaracterized the evidence, there is no basis to conclude that the sort of objectionable comments petitioner alludes to warrants *habeas* relief, especially where the defense counsel objected and the trial court sustained such objections. (Tr. 486.) In other words, as set forth below, an analysis of all of the factors demonstrates that neither the comment relating to petitioner's being "angry" or stating that he did not have a gun the night before the shooting, nor any of the other comments, individually or cumulatively, provide a basis for *habeas* relief.

First, it cannot be said that the statements "infected the trial" in such a manner as to deny due process and cause the resulting conviction. The remarks made by the prosecutor in summation, even assuming *arguendo* they were all error, were not an egregious error. In *Donnelly*, the Supreme Court found that a prosecutor's remark, while unambiguously improper, was merely trial error, and that the "distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct" that "amount[s] to a denial of constitutional due process" must be maintained. *Donnelly*, 416 U.S. at 647-48. Here, as noted above, it is not at all clear that the prosecutor's remarks were improper. However, even assuming *arguendo* that they were, the Court finds that the statements in the prosecutor's summation do not fall into the category of severe or egregious misconduct.

Second, any potential prejudice from the prosecutor's comments during the summation was cured by jury instructions that reminded jurors, among other things, that the arguments and remarks of counsel are not evidence. In particular, the Court instructed the jury, among other things: (1) that no inference could be drawn from the simple asking of any question and only a question coupled with an answer can be considered evidence (Tr. 531); (2) that the defendant has no obligation to offer evidence in his defense, and if he elects not to, the jury may draw no inference from such election (*Id.* at 511), nor may the jury draw any inference from defendant's choice not to testify at trial (*Id.*); (3) that the arguments of counsel, including the summations of counsel, are not evidence (*Id.* at 530-31); (4) that the jury must determine for themselves the truthfulness and accuracy of the testimony of each witness (*Id.* at 531-35); and (5) that before the jury can find the defendant guilty of a crime, the prosecutor must prove beyond a reasonable doubt every element of the crime, and that this burden never shifts from the prosecutor to the defendant (*Id.* at 510-12).

Similarly, in *Gonzalez*, where the prosecutor remarked on community safety, the Second Circuit held that the remark was inappropriate, but concluded that the error had been remedied by the trial court's instructions to the jury. 934 F.2d at 424. As in *Gonzalez*, any impropriety regarding the statements here by the prosecutor in summation were not severe enough to equate with the "egregious conduct" referred to in *Donnelly*, and any potential threat to petitioner's constitutional rights was effectively neutralized by the instructions of the trial judge. *See, e.g., United States v. Rivera*, 971 F.2d 876, 885 (2d Cir. 1992) (finding that the trial court's instructions cured any prejudice arising from prosecutorial error). Here, the trial court's instructions sufficiently remedied any potential prejudice.

Moreover, even if the Court were to accept petitioner's argument that all of the

prosecutor's comments during trial that he complains about constituted misconduct, the proof of petitioner's guilt was not impacted in any way by these allegedly improper comments and, thus, the comments were harmless. As the Second Circuit has noted, "[o]ften, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981); *see also Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (holding that review of a *habeas corpus* challenge based upon prosecutorial misconduct includes consideration of "whether the conviction was certain absent the prejudicial conduct").

As noted *supra,* the evidence of guilt established by the prosecution in the case was not impacted by the allegedly improper remarks. Although the prosecution only had one occurrence witness, as discussed above, the Second Circuit has emphasized that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *Danzey*, 594 F.2d at 916. The jury found Bethune to be a credible witness at trial based upon the corroboration of his testimony and this Court will not disturb that determination which, as discussed above, was amply supported by the record. Moreover, the trial judge spent an enormous amount of time instructing the jury as to Bethune's credibility. For instance, the judge stated:

> Now, I will talk to you about the identification evidence from Carlos Bethune. He is the only witness who identified the defendant as the shooter and he

testified that he recognized the defendant at a lineup. The entire case against the defendant, connecting him to the alleged crime, is these identifications by Carlos Bethune. Testimony of only one witness identifying the defendant in court as the person who committed a crime, or that witness's testimony about his identification of the defendant at a lineup, is enough to prove the element of identity, but only if you believed the honesty, accuracy and reliability of that identification beyond a reasonable doubt, after you carefully examine that identification and after you consider all the other evidence presented by both sides.

(Tr. 534-35.) The evidence at trial showed that Bethune had a clear view of petitioner and immediately recognized him as the shooter. Any of the alleged comments made by the prosecutor in summation were inconsequential to petitioner's guilt based upon Bethune's testimony and the corroboration of that testimony.

Given the evidence in the prosecution's case against petitioner, the Court finds that petitioner has failed to demonstrate "actual prejudice." *See Bentley*, 41 F.3d at 825 (finding harmless error and a failure to demonstrate a substantial or injurious effect where there was "compelling evidence in the prosecution's case . . . [and] the prosecutor's summation comments were both brief and isolated"); *see also Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) ("The clear evidence of guilt demonstrates that [petitioner]

27

was not . . . prejudiced by the prosecutor's improper . . . remarks.").

In sum, in light of the evidence at trial, this Court finds that the prosecution's summation did not cause the petitioner to suffer any actual prejudice that would have had an injurious effect or influence on the jury's verdict. Accordingly, there is no basis for *habeas* relief based on the prosecutorial misconduct claim.

### E. Unconstitutional Vagueness

Petitioner also contends that the depraved indifference murder statute is unconstitutionally vague. Specifically, petitioner argues that "the judge, in his charge to the jury, made depraved indifference murder virtually indistinguishable from reckless manslaughter." (Petition, at 21.) As set forth below, the Court finds this argument to be without merit.

Under the vagueness doctrine, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *accord United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999); *see Rogers v. Tennessee*, 532 U.S. 451, 459 (2001) (holding that right to fair warning "bear[s] on the constitutionality of attaching criminal penalties to what previously had been innocent conduct"); *Marks v. United States*, 430 U.S. 188, 191 (1977) ("[P]ersons have a right to fair warning of that conduct which will give rise to criminal penalties."). Due process requires that a criminal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see United States v. Whittaker*, 999 F.2d 38, 42 (2d Cir. 1993). Where a statute does not regulate First Amendment interests, the "statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *accord Whittaker*, 999 F.2d at 42. Courts use a two-part test to determine whether a statute is unconstitutionally vague as applied: "a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) (internal quotations, citations, and alteration omitted). "Because the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *Id.*

As discussed above, the New York depraved indifference murder statute provides that a person is guilty when "[u]nder the circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25[2]. In contrast, a person is guilty of second degree manslaughter when he "recklessly causes the death of another person." N.Y. Penal Law § 125.15[2]. Recklessness occurs when a person "is aware of and consciously disregards a substantial and unjustifiable risk" and the risk "constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." N.Y. Penal Law § 15.03[3].

The New York Court of Appeals has explicitly rejected void-for-vagueness

challenges to the depraved indifference statute. *See People v. Johnson*, 87 N.Y.2d 357 (N.Y. 1996); *People v. Cole*, 85 N.Y.2d 990, 992 (N.Y. 1995); *People v. Poplis*, 30 N.Y.2d 85, 88 (N.Y. 1972); *see also People v. Brown*, 804 N.Y.S.2d 209 (N.Y. App. Div. 2005); *People v. Joyner*, 755 N.Y.S.2d 866 (N.Y. App. Div. 2003). In addition, almost all federal courts in this circuit have similarly upheld the constitutionality of New York's depraved indifference statute in rejecting claims of vagueness.[21] *See, e.g., Farr v. Greiner*, No. 01 Civ. 6921 (NG) (MDG), 2007 WL 1094160, at *26 (E.D.N.Y. Apr. 10, 2007) (collecting cases); *see also Guzman*, 425 F. Supp. 2d at 320; *Salcedo v. Phillips*, No. 04 Civ. 7964, 2005 WL 2211318, at *31 n.9 (PAC) (GWG) (S.D.N.Y. Sept. 13, 2005); *Mannix v. Philips*, 390 F. Supp. 2d 280, 292 (S.D.N.Y. 2005); *Summerville v. Conway*, No. 07 Civ. 4830 (BMC) (RML), 2008 WL 3165860, at *10 (E.D.N.Y. Aug. 6, 2008). This Court agrees with the analysis by the overwhelming majority of federal courts that have held that the depraved indifference murder statute gives the accused fair warning that his conduct was "criminal" and "proscribed" since ordinary people would understand that shooting at

---

[21] Only one district judge has held that the New York depraved indifference statute is unconstitutional. *See St. Helen v. Senkowski*, No. 02 Civ. 10248, 2003 U.S. Dist. LEXIS 26642, at *9-*10 (S.D.N.Y. Sept. 19, 2003), *rev'd on other grounds*, 374 F.3d 181 (2d Cir. 2004); *Jones v. Keane*, No. 02 Civ. 01804 (CLB), 2002 WL 33985141, at *5 (S.D.N.Y. May 22, 2002), *rev'd on other grounds*, 329 F.3d 290 (2d Cir. 2003); *see also Rustici*, 497 F. Supp. 2d at 481 (collecting and discussing cases). Although the issue was recently before the Second Circuit in *Rustici v. Phillips*, No. 07-3789-pr, 2009 WL 159262, at *2 (2d Cir. Jan. 23, 2009), the Second Circuit did not reach the issue because it found that the vagueness claim was technically exhausted but procedurally barred.

someone at short range in the vicinity of others would be criminal and put them at risk of a homicide conviction. *See Mannix*, 390 F. Supp. 2d at 291-92; *Salcedo*, 2005 WL 2211318, at *28 & n.8. Moreover, New York courts have applied the depraved indifference murder statute to conduct similar to that of petitioner's. *See, e.g., People v. Fenner*, 463 N.E.2d 617 (N.Y. 1984) (finding evidence sufficient for depraved indifference murder where defendant shot at two of the four people with whom he had been fighting while they attempted to run away from defendant); *People v. Lopez*, 602 N.Y.S.2d 872 (N.Y. App. Div. 1993) (finding evidence that defendant shot victim after a fight and attempt by victim's friend to appease defendant established depraved indifference to human life). Thus, based on the statutory language and case law that existed at the time the crime was committed, petitioner was on notice that his conduct was proscribed by the depraved indifference murder statute.

The second prong of the vagueness analysis concerns whether the statute provides sufficient guidelines to the police, prosecutors, judges, and juries to prevent arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357. "[S]ome ambiguity in a statute's meaning is constitutionally tolerable." *United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir. 1999). Here, as discussed above, virtually all courts in this Circuit have upheld the constitutionality of the statute. The language of the statute, regarding both "recklessness" and "conduct which creates a grave risk of death," has been found to be sufficient to prevent arbitrary and discriminatory enforcement. This Court agrees with that analysis.

Furthermore, the jury instructions administered in this case gave the jury

sufficient guidelines to prevent arbitrary or discriminatory application of the statute. The trial judge clearly distinguished the depraved indifference murder charge from the manslaughter in the second degree charge by emphasizing a finding of circumstances evincing a depraved indifference to human life. (Tr. at 517-20.) In addition to providing the statutory definition of recklessness, the trial judge instructed that:

> [D]epraved indifference to human life is much more serious and blameworthy than conduct that is merely reckless, because the conduct is much more dangerous. Circumstances evincing a depraved indifference to human life exists when, in the judgment of the jury, beyond a reasonable doubt, the defendant's conduct, beyond being reckless, was so highly and immediately dangerous to life and so wanton, without regard for or caring about the results to human life, and deficient in moral sense or concern, that it warrants the same level of criminal blame as the law imposes on someone who intentionally causes a person's death even though there is no intent to kill.

(Tr. at 519.) The trial judge's instruction was unambiguous and limited the jury's discretion. Thus, this is not a case where a statute permitted a jury "to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

Finally, the trial court also specifically instructed the jury to consider the depraved indifference charge first and, if it found that those elements were proven, they should "not consider" the charge of manslaughter in the first or second degree. (Tr. at 520-21.) The Court thus limited the jury as to which charge to consider. *See Mannix*, 390 F. Supp. 2d at 293. Thus, this Court, consistent with the weight of the federal and state cases that have previously addressed the question, finds that New York's depraved indifference murder statute is not unconstitutionally vague and does not allow for unlimited or arbitrary discretion in its application. Accordingly, petitioner's vagueness claim is without merit.

## F. Ineffective Assistance of Trial Counsel

Petitioner claims that he was denied the effective assistance of counsel at trial because trial counsel: (1) failed to object to the re-opening of the post-trial hearing; (2) made statements that disparaged the credibility of members of petitioner's family when trial counsel sought withdrawal from representation; and (3) failed to call witnesses. The Court finds, for the reasons set forth below, that petitioner's arguments do not constitute ineffective assistance of counsel under *Strickland* and concludes that the state court reasonably applied *Strickland* to the facts of this case.

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 688 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

30

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision, *DeLuca v. Lord*, 77 F.3d 578, 588 n. 3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (citing *Strickland*, 466 U.S. at 690-91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to the defendant. The defendant is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermines

confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). [T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

This Court proceeds to examine each prong in turn, keeping in mind that a *habeas* petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, petitioner's claim fails to satisfy either element.

## 1. Performance of Defense Counsel

In order to meet the first prong of the *Strickland* test, "a defendant must show that counsel's representation 'fell below an objective standard of reasonableness' determined according to 'prevailing professional norms' . . . . Counsel's performance is examined from counsel's perspective at the time of and under the circumstances of trial." *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 688); *see also Davis*, 428 F.3d at 88 ("When assessing whether or not counsel's performance 'fell below an objective standard of reasonableness . . . under prevailing professional norms,' Strickland directs us to consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from counsel's point of view.") (quoting *Strickland*, 466 U.S. at 688-89). Therefore, "'[j]udicial scrutiny of a counsel's performance must be highly deferential . . . [and] every effort [must] be made to eliminate the distorting effects of

hindsight.'" *Cox*, 387 F.3d at 198 (quoting *Strickland*, 466 U.S. at 689); *see also Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (explaining scrutiny is deferential because "'it is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable'") (quoting *Strickland*, 466 U.S. at 689).

In particular, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689); *see also Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (explaining that in order to show ineffective assistance, "defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy") (citation and quotation marks omitted); *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) ("As a general rule, a habeas petitioner will be able to demonstrate that a trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken.") (citation and quotation marks omitted). For that reason, "[s]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable . . . and there is a strong presumption that counsel's performance falls 'within the wide range of reasonable professional assistance.'" *Gersten*, 426 F.3d at 607 (quoting *Strickland*, 466 U.S. at 689-90); *see also Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (explaining that representation is deficient only if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally

competent assistance") (citation and quotation marks omitted).

Finally, in determining whether one or more errors by trial counsel renders the representation constitutionally deficient under the first prong of *Strickland*, the Court "need not decide whether one or another or less than all of these . . . errors would suffice, because *Strickland* directs us to look at the 'totality of the evidence before the judge or jury,' keeping in mind that 'some errors [ ] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . .'" *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 695-96).

Here, the Court has "assess[ed] the impact of [trial counsel's representation] in the aggregate," *Lindstadt*, 239 F.3d at 204, and, as set forth below, concludes that petitioner's claims of ineffective assistance of trial counsel fail to demonstrate a basis for relief. Specifically, petitioner's claims that counsel failed to object to the reopening of the hearing, made disparaging remarks while withdrawing his representation, and failed to call critical defense witnesses during trial, do not, taken individually or cumulatively, reach the constitutional threshold of professional unreasonableness set forth by *Strickland*.

a. Failure to Object to Reopening of the Hearing

Petitioner's argument that counsel failed to object to the reopening of the hearing is without merit. In fact, trial counsel did object to the reopened hearing on the ground that Michael Archer's affidavit and the new evidence of Mendoza's incarceration did not undermine the truthfulness of Bethune's recantation. (PT1. at 5.) Although trial

counsel did not address the issue of whether the Esteban Mendoza who was incarcerated in Florida was the same person who visited Bethune, it was not unreasonable that counsel failed to address this issue because the trial court, on its own, stated that it needed the prosecution to provide proof that the two Mendozas were the same person. (*Id.* at 4.) Moreover, the prosecution had already stated that they would seek to supply it. (*Id.*) Accordingly, the Court finds that counsel did object to the trial hearing and neglecting to address the Mendoza issue was not "outside the wide range of professionally competent assistance."[22]

### b. Disparaging Remarks

Petitioner's argument that his trial counsel made disparaging remarks that influenced the court to vacate its order to set aside the verdict is similarly without merit. First, as a threshold matter, trial counsel did not act unreasonably in withdrawing his representation, because he could not participate in the presentation of evidence which is obviously false or which counsel knows for a fact to be false. *See* 22

---

[22] Moreover, as discussed *supra*, even assuming *arguendo* that counsel's failure to address the Mendoza issue was objectively unreasonable, such action did not result in any prejudice to petitioner. The court based its decision to reopen the hearing on its inherent power to reexamine actions that may have been obtained by fraud, and while the issue of whether Mendoza was incarcerated was relevant to its examination, the Court ultimately decided to vacate the order setting aside the verdict based on the testimony of Reynaldo and Bethune and the audiotapes made by Reynaldo. Thus, contrary to petitioner's claims, the hearing would still have been reopened based upon the prosecution's good faith belief in the fraudulent inducement of Bethune's recantation, and the Mendoza issue was thereafter properly examined by the court.

N.Y. C.R.R. § 1200.33(A) (6); MODEL CODE OF PROF'L RESPONSIBILITY DR 7-102 (A)(4)(6). Counsel had explained to the court why he was seeking to withdraw representation, but he never told the trial court that the petitioner was factually guilty. Counsel stated that, even though he had no good faith basis for going forward with opposing the motion to set aside the verdict, he did not know whether petitioner was guilty or innocent. (PT2. at 24-26.) Accordingly, counsel was required to substantiate the reasons for his withdrawal, and was not acting unreasonably for doing so.

Moreover, the record does not support any contention that trial counsel's remarks influenced the court to vacate its order setting aside the verdict. Rather, the record shows that the court's vacatur of its order was based upon its findings drawn from the evidence at the reopened hearing, which consisted of the testimony of Reynaldo and Bethune, and the audiotapes that Reynaldo made. The court's decision did not reference any statements counsel made during his request to withdraw, and there is no indication that the court gave such comments any consideration in its decision. Accordingly, the Court finds that the statements trial counsel made when the court was deciding whether to vacate its order to set aside the verdict did not constitute ineffective performance.

### c. Failure to Call Witnesses

Petitioner also argues that trial counsel "failed to call critical defense eyewitnesses, misleading defendant as to reasons certain witnesses were not called." (*See* Petition, at 4.)

"[T]he tactical decision of whether to call specific witnesses – even ones that might offer

exculpatory evidence – is ordinarily not viewed as a lapse of professional representation." *United States v. Schmidt*, 105 F.2d 82, 90 (2d Cir. 1997); *see also United States v. Romero*, 54 F.3d 56, 60 (2d Cir. 1995). However, unexplained failures to call credible alibi witnesses cannot be considered reasonable trial strategy. *See Pavel*, 261 F.3d at 217-20. Moreover, the failure to investigate potential alibi witnesses is particularly egregious. *See id.* at 220-22 & nn. 13-14; *see also Lindstadt v. Keane*, 239 F.3d 191, 199-204 (2d Cir. 2001).

As a threshold matter, although courts may hold an evidentiary hearing to allow an allegedly ineffective attorney an opportunity to be heard and to present evidence, *Sparman v. Edwards*, 154. F.3d 51, 52 (2d Cir. 1998), this Court finds that such an inquiry is unnecessary here based on a review of the available state court record. The record, as discussed and cited *infra*, includes both trial testimony and affidavits submitted by the petitioner that are replete with references to the strategy that Archer's counsel employed in this case, which was not to call every purported defense witness (regardless of credibility issues that could subject them to easy attack on impeachment), but rather calling three defense witnesses (who testified that defendant was not the shooter) and also concentrating on impeaching the credibility of the State's main witness, Bethune, to leave the jury's focus on an argument that the State had not met its burden of proof.[23]

Petitioner argues that he was denied his right to effective assistance of counsel by defense counsel's failure to call four additional individuals as witnesses – Kester Jones, Fritz Pierre, Amy Viera, and Theresa Miller. In denying the motion for ineffective assistance of counsel on this ground, the Supreme Court, Kings County, noted as an initial matter that defendant had failed to submit affidavits from these purported witnesses regarding their proposed testimony. *(See* Memorandum, dated July 19, 2004, at 3) (Respondent's Ex. M) ("Defendant's motion must be denied where, as herein, defendant's papers in support of this motion fail to include affidavits of his potential witnesses revelatory of their testimony which would have been given at trial. Defendant only submitted his own self serving affidavit and conclusory notes of an investigator who contacted these witnesses.") (citations omitted). Moreover, the court explained why it concluded that the decision not to call these witnesses was within sound trial strategy and, in any event, was unlikely to have altered the verdict:

> The record reveals defendant received meaningful representation and this Court rejects his claim which seeks to second guess his trial counsel's strategy. Both the defendant and trial counsel were aware of the potential witnesses. As counsel affirms there may have been strategic or other legitimate reasons for defense counsel not calling these witnesses and defendant agreed with each decision that was made . . . . Any error in choosing not to call Jones, Pierre, Viera and Miller as witnesses is not inconsistent with justifiable trial strategy . . . . Pierre, Viera, and Miller had

---

[23] Petitioner's counsel impeached the State's sole eyewitness, Bethune, by attacking the reliability of Bethune's sole identification and pointing out inconsistencies with his testimony through the use of the defense witnesses.

a friendly relationship with defendant. Defendant was friendly enough with Viera and Miller to tell them they could watch him urinate and he continued to talk to them as he relieved himself. Following the shooting Pierre went to the roof of defendant's building, then to defendant's apartment where Pierre went to sleep. Even though these witnesses were not as close to defendant as the witnesses called, the jury could have rejected their testimony based on their relationships with the defendant as well. Lastly, the purported testimony of the uncalled witnesses would have been cumulative and even if offered the jury was unlikely to have changed their verdict.

*Id.* at 4 (citations omitted). Finally, the court noted that Pierre also had a prior robbery conviction.

This Court concludes that the state court decision was not an unreasonable application of *Strickland,* nor was it based on an unreasonable determination of the facts in light of the evidence presented in state court. There is no evidence in the record to suggest that counsel's decisions not to call these witnesses were anything other than strategic choices made after thorough investigation. First, although trial counsel did not call all of the witnesses defendant now asserts should have been called, counsel did call three defense witnesses – two of the witnesses testified they saw the shooting and alleged that the shooter was Yassir Julio and not the defendant. The third defense witness testified that defendant was urinating in an alley when the shots were fired.

Trial counsel's affidavit to the state court adequately explained his strategic reasons for not calling the other witnesses. "Counsel's decisions, seen in the context of his vigorous attack on the reliability of the identification of [petitioner] by the only eyewitness, fall within 'the wide range of professionally competent assistance.'" *Perkins v. Comm'r of Corr. Servs.,* No. 06-0608, 2007 WL 627515, at *2 (2d Cir. Feb. 23, 2007) (quoting *Strickland v. Washington,* 466 U.S. 668, 690 (1984)). The record demonstrates that counsel reasonably investigated the possibility that the above-listed individuals could be called as witnesses and, with petitioner's concurrence, the strategic decision was made not to call them. Specifically, petitioner's trial attorney, Jesse A. Young, stated in his affidavit,

> All potential witnesses who were interviewed in this case were carefully considered as trial witnesses and their testimony, backgrounds and availability were discussed at length with the Defendant long before the close of the Defendant's case at trial. After consultation with the Defendant, and members of Defendant's family, Defense counsel made the strategic decision to call certain witnesses and not to call others. For example, on witness, "Junior" a/k/a "Fritz" Pierre had a prior robbery conviction, another witness, Derrick St. John a/k/a "Diesel" had 2 prior felonies, one for Assault and the other one for Robbery. A

third witness, Shishonda Smith, a cousin of the Defendant, was simply "too emotional and should not be called as a witness," according to Defendant's Mother. In each case, however, as to each potential witness, the Defendant was fully informed and consulted and he agreed with each decision that was made at the time.

(Young Aff., dated June 16, 2004 ¶ 3.) Petitioner does not deny that these other witnesses would have provided testimony cumulative of that already provided by other defense witnesses, but instead argues that they would have been stronger witnesses because they were not close to the defendant and did not carry prior records. However, as noted by the state court, that assertion is contradicted by the record. For example, purported witnesses Amy Viera and Theresa Miller were allegedly conversing with defendant at the time the shots were fired and, thus, could not claim to have no relationship to petitioner. (*See* Defendant's Motion to Vacate, Exs. C and D) (Respondent's Ex. J). Similarly, purported witness Fritz Pierre had a friendly relationship with defendant because he allegedly accompanied defendant to the roof of defendant's apartment building after the shooting. (*Id.* at Ex. B.) Finally, although purported witness Kester Jones claimed to not have a close relationship with the petitioner or "his crew" and simply knew petitioner because they live on the same block, his testimony also was problematic because, among other things, his statement, which included the fact that he had not seen petitioner since the shooting, supported the prosecution's theory that petitioner's flight to Pennsylvania after the shooting was evidence of petitioner's

consciousness of guilt. (*Id.* at Ex. A.) Given this record, the Court finds that trial "counsel could have reasonably determined that the [witness'] testimony would have been cumulative or repetitive." *Ortiz v. Barkley,* 558 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing *Skinner v. Duncan,* No. 01 Civ. 6656 (DAB) (AJP), 2003 WL 21386032, at *38 (S.D.N.Y. June 17, 2003) (Peck, M.J.) ("The failure to call cumulative or repetitive witnesses is neither ineffective nor prejudicial.")). In other words, the state court did not err when it found that the trial counsel's decision to call three defense witnesses, rather than call all of the various witnesses defendant now suggests should have been called (with various impeachment issues) and to attack the credibility of the prosecution's main witness, was not objectively unreasonable.

### 2. Prejudice to the Defendant

The second prong of the *Strickland* test requires petitioner to show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Murden,* 497 F.3d at 198 (quoting *Strickland,* 466 U.S. at 694); *Pavel,* 261 F.3d at 226 (same). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt,* 239 F.3d at 204 (quoting *Strickland,* 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland,* the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir.

2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

In the instant case, even assuming *arguendo* that these errors constituted ineffective performance, petitioner has failed to demonstrate any prejudice that resulted therefrom. First, even assuming *arguendo* that trial counsel's failure to object to re-opening the hearing and remarks in withdrawing was objectively unreasonable, the Court finds that there is no reasonable probability that, but for counsel's errors, the result would have been different. The trial court had a good reason to reopen the hearing based upon the prosecution's good faith belief that Bethune's recantation was fraudulent. The affidavit of Michael Archer that he did not want to testify against Reynaldo partly substantiated the allegation that Bethune's recantation resulted from an agreement between Reynaldo and Michael Archer to free both petitioner and Reynaldo from incarceration. Thus, the issue of whether Reynaldo and Michael Archer had an agreement was going to be explored at the reopened hearing, regardless of any objections or comments by defense counsel. In light of the overwhelming legal authority adverse to petitioner's position on the issues discussed herein, the trial court would have certainly rejected any such objections by trial counsel. Moreover, as to defense counsel's statement in withdrawing, there is no basis to conclude it had any impact, especially because the evidence during the hearing overwhelming demonstrated that Bethune's recantation was fraudulent. No one from the Archer family testified at the reopened hearing. At the end of the initial hearing, the court set aside the verdict based on Bethune's recantation, not on the basis of the audiotapes Michael and Nathan Archer made of the purported confession of Julio. At the end of the reopened hearing, the court reinstated the verdict based upon the testimony of Reynaldo and Bethune regarding this fraudulent agreement. Therefore, this Court finds that there is no reasonable probability that, but for counsel's remarks in withdrawing, the result of the proceeding would have been different. Finally, as discussed above, the failure to call certain witnesses would not have affected the outcome of the trial given that their alleged testimony would have been cumulative of the other defense witnesses at the trial and subject to impeachment on various grounds. This Court, therefore, declines to find that the state court unreasonably applied federal law in failing to find petitioner's trial counsel ineffective.

## G. Ineffective Assistance of Appellate Counsel

Petitioner also argues a claim of ineffective assistance of appellate counsel. A criminal defendant has the right to the effective assistance of counsel on the direct appeal of his conviction. *See Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985). In determining whether appellate counsel has rendered constitutionally effective assistance, courts will similarly apply the standard established in *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984), for analyzing such claims as to trial counsel, as discussed above. *See, e.g., Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones*, 463 U.S. at 750-54 (1983)); *see also Strickland*, 466 U.S. at 690-91 (noting that appellate counsel's strategic choices with regard to which claims to bring on appeal are

"virtually unchallengeable"). As the Supreme Court has noted, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52); *accord Sellan v. Kuhlman*, 261 F.3d 303, 317 (2d Cir. 2001). Thus, reviewing courts should not "second-guess" the reasonable professional judgments of appellate counsel as to the most promising appeal issues. *Jones*, 463 U.S. 745; *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Instead, as the Second Circuit has observed:

> [T]he district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome.

*Mayo*, 13 F.3d at 533 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)).

In the instant case, petitioner argues that appellate counsel failed to communicate with him and was ineffective for (1) failing to raise other stronger claims, (2) raising the excessive sentence claim inadequately because counsel wrote only one sentence in support of the claim, and (3) failing to raise the excessive sentence claim and other issues brought up in petitioner's *pro-se* supplemental brief to the Court of Appeals. For the reasons set forth below, this Court finds that petitioner's claim as to appellate counsel's ineffectiveness is without merit and the state court did not unreasonably apply federal law in rejecting petitioner's claim.

### a. Failure to Raise Other Claims

Petitioner argues that appellate counsel was ineffective for failing to raise other stronger claims. Specifically, petitioner argues that appellate counsel should have raised claims regarding the legal insufficiency of the evidence, Bethune's alleged perjury, and *Parker* warnings. As a threshold matter, as noted *supra*, petitioner's legal insufficiency of the evidence and Bethune's alleged perjury claims do not provide a basis for *habeas* relief; thus, appellate counsel was not ineffective for failing to raise these claims. Even if counsel did raise these claims, since none of the claims succeeded (when raised in the *pro se* supplemental filing), petitioner was not prejudiced by their omissions. For the reasons set forth below, the Court also finds that counsel's failure to raise the *Parker* warnings did not violate petitioner's right to effective assistance of appellate counsel.

With respect to the failure to raise claims regarding insufficiency of evidence and Bethune's perjury, as discussed above, appellate counsel was not obliged to raise every nonfrivolous argument that petitioner wished to pursue. *See Evitts*, 469 U.S. at 394; *Jones*, 463 U.S. at 751-52; *Aparicio*, 269 F.3d at 95; *Mayo*, 13 F.3d at 533. Instead, appellate counsel advised petitioner that he could file a *pro se* supplemental brief with the Appellate Division. (*See* Letter from Harvey A. Herbert to petitioner, dated July 10, 2003.) In fact, petitioner did file a timely supplemental

appellate brief which set forth the claims of legal insufficiency of evidence and Bethune's alleged perjury that petitioner intended to raise. *See* Defendant-Appellant's *Pro-Se* Supplemental Brief; N.Y. Ct. Rules § 670.12(h) (requiring that *pro se* supplemental brief be filed within 30 days of mailing to the petitioner of brief prepared by counsel). Petitioner's arguments were denied on the merits by the Appellate Division on September 30, 2004. The fact that the claims were raised in the supplemental brief, rather than the main brief, had no affect on the review of the claim.

Petitioner also claims that he should have received *Parker* warnings that would have alerted him to the possibility that the trial court would proceed in his absence if he failed to appear for the re-opened hearing. *See People v. Parker*, 440 N.E.2d 1313 (N.Y. 1982). However, appellate counsel was reasonable for not raising it, because the claim also had no merit. Petitioner was not entitled to *Parker* warnings because, "if a defendant deliberately leaves the courtroom after his trial has begun, he forfeits his right to be present at trial regardless of whether he knows that the trial will continue in his absence." *People v. Sanchez*, 65 N.Y.2d 436, 443-44 (1985). Here, petitioner knew a reopened hearing would take place, and yet he voluntarily chose not to attend, despite the trial court's warning to the petitioner prior to granting petitioner's request for bail, that "you have to be here when you're supposed to be here." (PT1. at 40.)

Thus, even if counsel's decision not to raise these claims fell outside the "wide range of professionally competent assistance," since none of the claims counsel declined to raise did succeed when raised by petitioner in his *pro se* filing and would not have succeeded if raised by appellate counsel, petitioner was not prejudiced.

### b. Excessive Sentence Claim

Petitioner's complaint regarding the manner in which appellate counsel raised the excessive sentence claim is also without merit. Petitioner appears to argue that appellate counsel inadequately raised the excessive sentence claim because the argument consisted of a single sentence. The Court disagrees.

As a threshold matter, although the single sentence appellate counsel wrote in raising the claim did not give the court any specific reasons why the sentence should be reduced, this issue was nonetheless raised before the Second Department for consideration. Moreover, despite petitioner's allegation to the contrary, appellate counsel also submitted a pre-sentence report to the court. (*See* Herbert Aff. ¶ 5; Resp. Exh. R.) The Second Department specifically referenced the excessive sentence argument in its decision and rejected it. *See People v. Archer*, 11 A.D.3d at 705 ("The sentence imposed was not excessive."). Thus, there is no factual basis for any claim that appellate counsel was ineffective for failing to raise the issue of excessive sentence. *See Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001).

Second, to the extent petitioner contends that the appellate counsel inadequately raised the excessive sentencing issue by not providing a more detailed argument, the Court also rejects such claim. Although petitioner suggests in his memorandum of law that his appellate counsel did not adequately raise his excessive sentence claim, he also seems to fault appellate counsel for "raising a highly dubious claim of 'excessive sentence'" (Petitioner's Memorandum of Law, at 22) and not focusing more on the perjury and sufficiency of the evidence issues. In fact, petitioner acknowledges that the sentencing

argument "was significantly weaker than those raised in defendant's pro se supplemental brief." (*Id.*). In short, there is no basis for concluding that appellate counsel's decision to raise this extremely weak excessive sentencing claim, without making detailed arguments regarding that claim, was objectively unreasonable. *See Johnson v. Mazzuca*, No. 04 CV 5246, 2006 WL 2376383, at *6 (E.D.N.Y. Aug. 16, 2006) (finding that appellate counsel not ineffective in failing to address certain issues in more detail); *see also Duran v. Phillips*, No. 04 Civ. 302 (LTS) (FM), 2008 WL 3919195, at *8 (S.D.N.Y. Aug. 22, 2008) (rejecting ineffective assistance of appellate counsel claim where appellate counsel did raise excessive sentencing issue).

Finally, petitioner fails to show that, absent counsel's allegedly deficient performance on any sentencing issue, there was a "reasonable probability" that his appeal would have been successful before the state's highest court. Petitioner fails to explain why the sentence was excessive under New York law. Instead, he makes a conclusory assertion that "Criminal Possession of a Weapon in the Third Degree, the felony relied upon in sentencing defendant as a violent predicate, is not a violent crime and thus defendant is being held on an illegal sentence." (Petitioner's Memorandum of Law, at 22.) However, a number of subsections within the statute for Criminal Possession of Weapon in the Third Degree, qualify as a Class D violent felony offense, N.Y. Penal Law § 70.02(c), and petitioner has failed to show that his prior offense did not fall within such subsections. In fact, there is no indication that this issue was even raised at sentencing. Moreover, defendant's sentence of twenty-two years to life imprisonment is less than the maximum possible twenty-five years to life. The sentencing court has "wide latitude" in determining what is a fair and proportionate

sentence. *People v. Naranjo*, 681 N.E.2d 1272, 1273 (N.Y. 1997). Therefore, petitioner has failed to identify any prejudice regarding his appellate counsel's presentation of his excessive sentencing claim. Accordingly, there is no basis for a finding of ineffective assistance of appellate counsel as it relates to any excessive sentencing claim.[24]

### c. Failure to Raise Claims to Court of Appeals

Petitioner's complaint that appellate counsel failed to raise the excessive sentence claim and other claims in petitioner's *pro-se* supplemental brief to the New York Court of Appeals is also without merit. Appellate counsel was reasonable in not raising the claims in petitioner's *pro-se* supplemental brief because those claims had no merit, as set forth *supra*. Appellate counsel was also reasonable in not raising the excessive sentence claim because, to the extent that petitioner was seeking to modify a legal sentence in the interest of justice, the Court of Appeals has no power to make that type of discretionary sentencing reduction. *See* C.P.L § 470.15; *accord Duran v. Phillips*, 2008 WL 3919195, at *9 ("Although this argument could be considered by the Appellate Division, the New York Court of Appeals does not have the power to modify a legal sentence in the interest of justice."); *People v. Discala*, 45 N.Y.2d 38, 44 (1978) ("it is the Appellate Division and not

---

[24] To the extent petitioner is also attempting to raise an excessive sentence claim in his petition independent of his ineffective assistance of appellate counsel claim, the Court rejects such argument. Because his sentence was authorized by state statute, any excessive sentence claim could not provide a basis for *habeas* relief in this case. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

[the Court of Appeals], which is authorized to reduce a sentence in the exercise of its discretion and in the interest of justice.") (citation omitted). Moreover, to the extent that petitioner argues that appellate counsel should have raised some excessive sentencing claim to the Court of Appeals on constitutional or other permissible grounds, the Court, for the reasons discussed *supra*, finds that his sentencing claim as well as the other claims petitioner argues appellate counsel should have raised had no merit and it was not objectively unreasonable for appellate counsel to fail to raise them, nor did petitioner suffer any prejudice from the failure to raise them. In fact, on November 23, 2004, petitioner filed a supplemental leave application which set forth the other claims. (*See* Defendant-Appellant's *Pro-Se* Supp. Leave Application.) However, despite having these other claims and arguments before them, petitioner's request was denied by the Court of Appeals on December 21, 2004. Thus, since all of the claims counsel declined to raise did come before the Court of Appeals for consideration, petitioner clearly was not prejudiced.

In sum, after examining the merits of all of petitioner's claims, the Court concludes that the state court's decisions on his claims were not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented in state court.

IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Accordingly, the instant *habeas* petition is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Date:   April 13, 2009
        Central Islip, New York

* * *

Petitioner appears *pro se*. The attorney for respondent is Thomas M. Ross, Assistant District Attorney, Office of the Kings County District Attorney, 350 Jay Street, Brooklyn, NY 11201.

41